### Atlantic De Laine Company *v.* Tredick, Stokes & Co., & others.

If one to whom a piece of negotiable paper has been confided for a special use or limited purpose should attempt, in breach of the confidence reposed in him, to pervert the paper to a different use or purpose, a court of equity will, upon proper application, enjoin him from doing any act, though it be the carrying on of a suit at law, which he may make the means or instrument of his bad faith; and they who take the paper as indorsees from the party intrusted with it, after it is overdue, though for value, are subject to the same equities, and may be prevented in the same mode from misapplying it.

One of several notes on demand, with interest, given by a corporation before it had issued stock certificates to its stockholders, in evidence of their proportionate interest in certain of its own stock held by it in trust for them, and upon which no money was to be paid, was negotiated for value by a stockholder, thirteen months after its date; *Held,* that such note was overdue at the time it was taken by the holder, so as to entitle the corporation to enjoin a suit at law commenced by him to recover the amount of the note from them, upon the ground of the equities subsisting between them and the payee of the note.

BILL IN EQUITY to enjoin a suit at law, brought by the defendants, Tredick, Stokes & Co., upon a certain note on

demand, with interest, for the sum of $10,607.14, which the bill alleged was given by the plaintiff corporation to the defendants, Hill, Carpenter & Co., stockholders therein, as evidence only of the interest of that firm in certain shares in the capital stock of the corporation held in trust by the corporation for their benefit; the note, given and received as such evidence only, having been transferred by the defendants, Hill, Carpenter & Co., to the defendants, Tredick, Stokes & Co., after the same was overdue. The bill also prayed, that said note might be decreed to be delivered up to be cancelled, upon a transfer by the plaintiffs of the trust shares in their stock to those entitled, and for general relief.

The note was issued to Hill, Carpenter & Co., and bore date April 16, 1853, and was indorsed by them, as payees, to the defendants, Tredick, Stokes & Co., who were merchants in Philadelphia, as security for advances by them made to Hill, Carpenter & Co., thereon, to the full amount, about the 14th day of May, 1854, or upwards of a year after it bore date. After the failure of Hill, Carpenter & Co., which took place on the 13th of December, 1854, and in the fall of 1856, the defendants, Tredick, Stokes & Co., commenced a suit in this court against the plaintiffs, to compel payment of this note; whereupon this bill was filed to obtain the above relief. The answer of the defendants, Tredick, Stokes & Co., in substance, denied all knowledge of the circumstances under which, and the purpose for which, said note was given by the plaintiffs to Hill, Carpenter & Co., and averred, circumstantially, their receipt of the same as security for advances by them made to that firm for the full amount, about the 14th day of March, 1854, in the ordinary course of business.

The answer of Hill, Carpenter & Co., who were also made defendants to the bill, denied that the note was given by the plaintiffs to them, or by them received, as evidence only of their interest in certain shares of the stock of the corporation held by it in trust for them; but averred, in substance, that it was given by the corporation to them in consideration of their permitting the corporation to receive from the assignee of Charles T. James a transfer of his shares in the stock of said corporation, freed from

a mortgage held by them, in common with the other stockholders, thereon, and transferred by their trustee to the corporation, which mortgage covered the balance of the loan, made by them with the other stockholders to James, for the benefit of the corporation; thus averring, that the note represented the value of their interest in the stock of James, upon which they had authorized a release of their mortgage lien to the corporation, and that the stock, thus released, was absolutely the property of the corporation.

It appeared from the proofs, that James, who was one of the projectors of, and largely interested in the Atlantic De Laine Company, a manufacturing concern at Olneyville, near Providence, was also a contractor for the building of their mill and furnishing it with machinery; and that, in the summer of 1851, when the company were largely in advance to him on his contracts, he became so embarrassed in his affairs, that he could not supply the machinery contracted for and advanced upon, so that the work was in danger of being stopped. In this emergency he applied to the company, which by this time had become incorporated, for aid, upon security; but his wants being so instant that there was not time to call a meeting of the company under their charter, all the stockholders, with the exception of Day, Owen & Co., of Hartford, who held only three shares, including the defendants Hill, Carpenter & Co., met him by appointment, and on the 1st day of August 1851, agreed to advance to him personally, in proportion to the amount of their stock in the De Laine Company, in cash and their paper, $75,000; they to receive in security for their advance, a mortgage to George W. Chapin, as their trustee, on James's shares or interest in the company, on all his real estate in Providence, Warwick, and Scituate, and on certain notes of the Cannellton Manufacturing Company of the state of Indiana secured by mortgage, and on a thousand shares in the capital stock of that company. The advance was made, and the security, at least to the extent of the mortgage on James's interest in the stock of the De Laine Company and on his real estate in Providence, Warwick and Scituate, received by Chapin as trustee; Hill,

15 *

Carpenter & Co.'s proportion of this advance, amounting, it would seem from the trustee's account rendered to them, to a little less than $18,000. This advance did not prove adequate to relieve James from his embarrassments, and he shortly after failed, and on the 2d day of September, 1851, made a voluntary assignment of his property to Lyman B. Frieze, in trust for his creditors; in one of the first clauses of which, he directed his assignee to go on and complete, out of the assigned property, his contracts with the De Laine Company, which were not yet completed, so that his creditors might receive from the company the balance which would be due to him on his contracts. The assignee being thus authorized, the De Laine Company, anxious to have their contracts completed so that they could go into operation, procured in October, 1851, from the assignee, an agreement by which, after reciting that the time for completing the contracts had long since elapsed, the assignee authorized the company to pay all such sums necessary to the completion of the contracts to which he might assent in writing, he stipulating to reimburse them therefor, with interest, out of the first moneys by him realized out of the assigned estate. Under this authority, the company proceeded to advance moneys for the completion of James's contracts with them; so that on the 16th day of April, 1853, there was due from the assigned estate to the De Laine Company a cash balance of $41,740.88, besides a claim for damages against James for not completing his contracts within the stipulated time, estimated by the company at about $50,000. For both these sums the company claimed a prior lien upon James's stock in the company, under the ordinary charter clause giving the company a lien upon the stock of each stockholder "for all debts and demands due and owing by him" to the company. It was also proved, that on the 16th day of April, 1853, there was due in cash from James to the stockholders, on account of the advance of $75,000 made by them to him on the 1st day of August, 1851, as appeared by the account of the trustee rendered, the sum of $43,092.58; the balance having been realized by them out of the property of James, other than his stock in the De Laine Company, mortgaged for their security. These accounts appeared to have been

made up to the above date, in order to some adjustment between the stockholders and the company of their conflicting claims to the corporate stock of James, under the mortgage of the one, and the charter lien of the other, and in consequence of a transfer of said stock to the company by the assignee, in the month previous, in full settlement of all claims of the company and of the stockholders upon James and his assignee. At the time of this settlement with James, the trustee for the stockholders, merely, as he swore, by advice of counsel and for the protection of the stock against any possible claim of James . thereto, and without consulting the stockholders, assigned the mortgage, made to him in trust for them, to the company, as more prudent than cancelling the same. This being the position of things, on the 16th day of April, 1853, some arrangement, it was evident, was come to, between the stockholders and the company, relative to the shares of the stock of the company which had been transferred by the assignee of James to the company in settlement of the claims of the company and of the stockholders upon both James and his assignee. It was in proof, that the stock, at that time, was of no value whatever; but as to what the arrangement concerning it was, the testimony was conflicting. Chapin, the treasurer of the company and the trustee for the stockholders, and who kept the books and accounts for both, swore, in substance, that the arrangement was, that the stock received from James should be held by the company in part for themselves and in part for the stockholders, in proportion to the amount due from James and his assignee to each; and that demand notes for the amount due from James to each stockholder should be issued to each stockholder as evidence of his proportionate interest in the stock, instead of certificates of stock; no certificates of the stock of the company having been then issued, on account of their entanglements with James. In this, he was confirmed by the testimony of Edwin Hoyt, of the firm of Hoyt & Tillinghast, New York, who were also stockholders, and, very minutely, by the testimony of Joseph Lea, of the firm of Hacker, Lea & Co., of Philadelphia, who were stockholders, and both of whom were present at the meeting at which the arrangement was made. They all swore too, that the

firm of Hill, Carpenter & Co. were represented at this meeting and consented to this arrangement, although Mr. Joseph Carpenter of that firm, it was agreed, was absent at that time, in Cuba, on account of his health. On the other hand, Carpenter, Hill, and Cross, of the firm of Hill, Carpenter & Co. swore, that they knew nothing of this arrangement, but supposed, that the De Laine Company, having assumed the stock and taken a release of the stockholders' mortgage upon it, gave their notes on demand to each of the stockholders, to cover the amounts remaining due to each of them for the balance of their advances made on the 1st of August to James, for the benefit of the company.

There was no written evidence as to the precise character of this arrangement, except what might be derived from the form in which the trustee made out the account of each stockholder; giving him credit for his advances, and charging to him what had been paid to him from the proceeds of the mortgaged property, and the amount of the demand note issued to him by the company, in full settlement of the account. At the time when the trustee's accounts were closed by the transfer to the company of James's stock, and the issue to each stockholder of the demand note of the company for the amount of his balance, the trustee settled his account with each stockholder, by giving the note of the company at six months, payable to his own order and by him indorsed, to each stockholder, for the balance due to each from the proceeds of the mortgaged property which had been realized by him for the stockholders, and which, as he had received it as trustee, he had, as treasurer, loaned to the company. In closing his trust account with each stockholder, he had enclosed in a letter an abstract of his account as trustee to each, together with the company's note on six months' time for the cash balance due to each, and the company's note on demand with interest for the balance, and sent the letter to each. The following is a copy of the letter which accompanied the abstract of his account as trustee with Hill, Carpenter & Co. and the two notes of the company of the above character; the demand note, which was the note in question, being enclosed by him to them at that time :—

"PROVIDENCE, April 23, 1853.

" Messrs. Hill, Carpenter & Co., Providence.

" Gentlemen,—Enclosed you have Atlantic De Laine Company's note, six months, 16th inst., for $2,126.68, and their note on demand with interest for $10,617.14, in settlement of my account with you, herein enclosed. The first note is your share of money received, but not before distributed. *The other is according to the arrangement made at the time of the settlement with Mr. Frieze.* I also enclose memo. of the trustee's account showing all the transactions. Trusting you will find all correct, I am

                    " Very truly yours,
     (Signed)                         " GEO. W. CHAPIN,
                                          " *Trustee.*"

Mr. Chapin testified, that the arrangement referred to by him in the above letter was the agreement of the stockholders, including Hill, Carpenter & Co., made at the time of the company's receiving the transfer of James's stock from Frieze, that demand notes were to be issued for the balance due each as evidence merely of the proportion in which they were to share in the stock; the company not to be called upon to pay money for them, but only, when it began to issue certificates of stock, to take up the note by transferring to each his proportion of this stock held by the company in trust for the stockholders.

It was in proof, that the company had not been called upon to pay money for these demand notes by any other of the stockholders; all of whom, with this exception, had surrendered them to the company upon receiving their proportion of the stock; although, the vote calling in these notes and issuing the stock instead was not passed until the 10th day of March, 1855, nearly three months subsequent to the failure of Hill, Carpenter & Co. There was some conflicting testimony as to what took place at a directors' meeting held in New York on the 6th day of April, 1853, at which Mr. Carpenter, of the firm of Hill, Carpenter & Co. was present, and presided, having just returned from Cuba; the conflict being, whether the arrangement, relied upon by the plaintiffs as made with regard to the issuing of these notes during his absence, was made known to him and dis-

cussed at that meeting ; but as it bears but indirectly upon the question whether such an arrangement was made during his absence with the assent of all concerned and as the basis of the issue by the company of the demand notes, it is unnecessary further to state it here. It was however sworn to by Chapin, Lea, and Hoyt, that at a meeting of the company held on the 9th of December, 1854, at Providence, and at which both Carpenter and Hill, of the firm of Hill, Carpenter & Co. were present, and at which an assessment on the stock of the company was made, that a proposal was then made and agreed to by all the stockholders to surrender the demand notes and take the stock according to the original agreement; at which meeting, no intimation was made by either Mr. Hill, or Mr. Carpenter, that they had pledged the demand note issued to them ; Carpenter remarking at the time, as Chapin swore, " This ought to have been done long ago." Chapin also swore, that when on the morning previous to the failure of Hill, Carpenter & Co. he called upon them for their demand note, and tendered them in lieu of it fourteen shares, their proportion of the trust stock, he for the first time learned that they had parted with the note ; and upon his expressing his great surprise to Carpenter, and asking him how they came to do it, his reply was, " Mr. Chapin, we never expected to be in this fix." The main evidence is thus minutely stated, because the main question in the case resolved itself into the question of fact, whether any such arrangement, as that set up in the bill, was really made.

*Payne* and *R. W. Greene,* for the complainants.

*Bradley* and *T. A. Jenckes,* for the respondents, cited Byles on Bills, (4th Amer. ed.) 258 ; *Croome* v. *Lediard,* 2 Myl. & K. 251 ; and relied greatly, as confirmatory of the witnesses for the respondent, on the fact, that the deed of transfer from Frieze to the De Laine Company indicated no such trust as the bill set up ; and that the pretence, that the demand notes were issued to the stockholders as mere certificates of their interest in that stock, was at war with what the notes themselves declared, as well as with the form of the accounts sent to the stockholders by the trustee inclosed along with them. They insisted, that the idea of impressing such a character upon

these notes, was never started until the 9th of December, 1853, when the failure of Hill, Carpenter & Co. was imminent, and after they had pledged the demand note in question, for value, to the defendants, Tredick, Stokes & Co.

AMES, C. J. If one to whom a piece of negotiable paper has been confided for a special use or limited purpose, should, in breach of the trust reposed in him, attempt to pervert the paper to a different use or purpose, it is quite within the competence of a court of equity, upon proper application, to enjoin him from doing any act, though it were the carrying on of a suit at law, which he made the means or instrument of his bad faith. They who purchase the paper, from the party intrusted with it, under circumstances deemed sufficient to apprise them that there is something wrong about his title to, or mode of using it, as, by purchasing or advancing upon it after it is overdue, are of course subject to the same equities, and may be prevented in the same way from misapplying it. The note, against the misapplication of which our aid is invoked in this cause, is payable on demand with interest, and was received for value by the defendants, Tredick, Stokes & Co., as they aver and admit in their answer, about thirteen months after its issue and date. In England, it would seem, such a note, indicating, it is said, on its face, a permanent loan or credit, is not deemed to be overdue during the period of legal limitation, without some evidence that payment has been demanded and refused. Byles on Bills, 131, 164, 165. This is not, however, the law of this country; but such a note is here held to be overdue when it has run a reasonable time from its issue or date; so that if it be negotiated after that time, the maker is let into proof of any equities in defence to an action of the indorsee upon it, of which he might have availed himself against the original payee. *Ayer* v. *Hutchins,* 4 Mass. 370; *Thurston* v. *McKown,* 6 Ib. 428; *Hemmenway* v. *Stone,* 7 Ib. 58; *Field* v. *Nickerson,* 13 Ib. 131, 137, 138; *Stockbridge* v. *Damon,* 5 Pick. 223; *Thompson* v. *Hale,* 6 Ib. 259; *Sylvester* v. *Crapo,* 15 Ib. 92; *Stevens* v. *Bruce,* 21 Ib. 193; *Ranger* v. *Cary,* 1 Met. 369; *American Bank* v. *Jenness,* 2 Ib. 288; *Knowles* v. *Parker,* 7 Ib. 31; *Tucker* v. *Smith,* 4 Greenl. 415; *Dennett* v. *Wyman et al.* 13 Verm. 485; *Camp* v. *Clark, Trustee,* 14 Ib.

287; *Nevins* v. *Townsend,* 6 Conn. 5; *Wetley* v. *Andrews,* 3 Hill, (N. Y.) R. 582; *Carll* v. *Brown,* 2 Mich. 401.

There is no case in this country which has gone so far as to hold such a note, when negotiated by the payee upwards of a year after its date, to be free from these equities, in the hands of the holder; and indeed, with regard to the note in question, when, as is proved, it was known to the defendants, Tredick, Stokes & Co., at the time they advanced upon it, to be a note, given so long before by a manufacturing corporation to one of its stockholders, it was not unreasonable for them to presume, that it was sent abroad to be drawn against, because it was not available at home.   A similar relation between the maker and payee of such a note, when negotiated, as security for money borrowed, before half this time had elapsed from its date, has been held by the supreme court of Massachusetts to put the indorsee upon inquiry, and to subject him to the equities existing between the original parties to the note.   *Thompson* v. *Hale,* 6 Pick. 259, 261.

The defendants, Tredick, Stokes & Co., must be deemed, therefore, to have taken this note when overdue, and subject to all the equities in relation to it which existed between the plaintiffs and the firm of Hill, Carpenter & Co.

The only question which remains, is, whether the plaintiffs have satisfactorily proved, as stated in their bill, that upon obtaining the transfer of one hundred and thirteen shares of James's stock in the De Laine mill from his assignee in full settlement of all their claims and the claims of their stockholders upon both, it was arranged and agreed between the stockholders, that about one half of this stock, free from the lien of the company, should be held by it in trust for the stockholders, each to be entitled thereto in proportion to the balance due to him for his advances to James; and that, as no stock certificates had been then issued on account of the embarrassments of the company with James, their treasurer should issue the demand notes of the company on interest, for no other purpose than to represent the relative proportions in which the stockholders were to receive the trust stock, when it should be thought fit for the company to issue stock certificates.

Considering that this stock was the property of, and acquired from James, through his assignee, upon the settlement of the competing claims of the company and of the stockholders against him and the assigned property, and that these claims were very nearly equal in amount, there is nothing so improbable in such an arrangement, as to make it difficult of proof. Nor, on the other hand, would it have been strange, under the circumstances, if this matter had been adjusted between the company and the stockholders, in the mode in which the defendants aver that it was; for, inasmuch as the stockholders made their advances to James for the benefit of the company, and merely because the company could not, under their charter, hold a meeting to sanction advances to him within the time requisite to make them available for his purposes, it might be said to be no more than reasonable that the company should assume the advances made by the stockholders, and issue their notes on demand for them, taking to themselves the whole stock obtained from the assignee of James upon settlement. In either case, the form of the papers made at the time to carry out the arrangement, though in strictness more appropriate to that supposed by the defendants, would not, amongst business men, under the circumstances, be singularly improper. Demand notes, on interest, are not available for ordinary business purposes; and, as we have before said, when issued by a mercantile or manufacturing company to its copartners or corporators, especially if they have been outstanding for some time, seem to carry with them an implication that they were given to be used as evidence, merely, in some future adjustment of the joint concern. Very little, too, if anything, can be inferred from the form in which the trustee stated his accounts with his *cestuis*, transcripts of which were enclosed by him to Hill, Carpenter & Co., along with the six months' note and the demand note of the company, which, according to the statement, balanced their claim for advances to James. It is true that the demand note, as well as the six months' note of the company, is, in the account stated with Hill, Carpenter & Co., charged to them against their advances; but what more proper than this, without reference to the terms and conditions upon which they had

agreed to hold the company's demand note, in an account designed merely to exhibit to them the mode in which the trustee, in his discharge, accounted for advances which he had disbursed and attended to for them ?    There is, in truth, no other mode of stating the account, known amongst accountants; whose practice, we had almost said instinct, leads them, in such statements, by every possible contrivance, to seek and obtain a balance.    It is evident, however, that some arrangement, consequent upon the transfer of James's stock to the company, had been made between the stockholders and the company, with regard to the closing up of the trust accounts, and the receipt by each stockholder, for the balance of his advances to James, of the notes on demand of the company; and it is fairly inferable, that this arrangement, whatever it was, was something special and different from what applied to the six months' notes of the company, enclosed to each along with the demand note, and different from what the face of the latter note implied.    In his contemporaneous letter to Hill, Carpenter & Co. of the date of April 23, 1853, enclosing the statement of his general account as trustee, and his account as trustee with them, along with the six months' note and the demand note of the company which balanced their account, the trustee, who was also treasurer of the company, thus writes to them :—

" The first note," which was the six months' note, " is your share of money received, but not before distributed;" as if to say, that from the very nature of the case, it would be paid at maturity.  " The other," which was the demand note, "is according to the arrangement made at the time of the settlement with Mr. Frieze ;" as if it were to be treated in a mode different from the other note, specially arranged on the occasion to which he refers, and different from what the note, presently payable, on its face imported.    Now Chapin, who, as trustee of the stockholders and treasurer of the company, kept or superintended the keeping of the accounts of both, and as the man relied upon by both to attend to and carry out any arrangement which might have been made in this matter, was in a position to know and to recollect it, swears positively, and distinctly, that the arrangement referred to by him in this letter to Hill, Car-

penter & Co., and which had been previously assented to by all the stockholders, was, that the demand notes were to be held by them as representing only their proportionate interest in the trust stock, in lieu of stock certificates; and that the company was not to be called upon to respond to them, except by a transfer to each of his proportionate share of the trust stock when it got ready to issue stock certificates. In this, as well as in his other testimony with regard to the assent of Hill, Carpenter & Co. to this arrangement, he is confirmed by the testimony of Lea and of Hoyt, and with great minuteness and exactitude of statement by the former, so as to leave no refuge for him or for them against the guilt of perjury, if they have not sworn to the truth. On the other hand, of the witnesses opposed to these, which witnesses are members of the firm of Hill, Carpenter & Co., Carpenter, the active partner of the firm, was out of the country at the time of the arrangement made with regard to these demand notes, and could have known what that arrangement was only from subsequent report. Cross, another member of that firm, does not seem to have been present at any meeting, either of the stockholders or directors of the company, and swears, upon this subject, only to what he understood from Chapin; and Hill, the senior partner of the firm, swears, in substance, that he has no knowledge of any such arrangement, and *"was always under an impression that the De Laine Company assumed the payment of the balance due from James."* It is impossible to give equal weight to such testimony, with that of the positive and detailed statements of Chapin and Lea, confirmed by the more general testimony of Hoyt; all of whom were in a position to know the facts about which they swear, and the former of whom, as the trusted agent of both the company and stockholders, and acting in the transaction for both, could not possibly have been mistaken with regard to the character of it. In comparing the testimony of these defendants with the testimony of the witnesses on the part of the plaintiffs, and especially as to what was said by Chapin to Cross when he called upon him about the closing up of the trust account, it is easy to see how reconcilable it is, without imputing perjury to either, upon the supposition that

the former, from a confusion of memory, not very strange, now attributes to the demand notes, what the latter agrees that he said, or might have said, with regard to the six months' notes. Indeed, in excuse for the non-recollection by the members of the firm of Hill, Carpenter & Co. of what agreement was entered into by them with regard to this demand note, and for the disposition which they subsequently made of it in breach of that agreement, some allowance must be made on account of the harassing position in which they were placed, ending in their failure on the 13th of December, 1854, a hint of which we have in what was said by Carpenter to Chapin in their excuse for pledging this note: " We never expected to be in this fix."

It adds something to the relative weight of the testimony of the plaintiffs, that these demand notes, including the one in question, have been so long outstanding, and have all, with the exception of this, been surrendered by the stockholders to the company upon receiving from it a transfer of their proportion of the trust stock. The suggestion, in answer to this, that the surrender of these notes took place subsequently to the failure of Hill, Carpenter & Co., and to protect the company against the payment of this note, and indeed that the arrangement itself, now pretended, was never thought of until the 9th of December, 1854, when the failure of that firm was imminent, can find credence only upon the theory, that, to shield the De Laine Company from its liability to pay this note, the stockholders of that company have deliberately planned a fraud, which three of the principal of them are endeavoring to carry out by the rankest perjury. There is nothing in this case, and nothing made known to us concerning these stockholders and witnesses, which would justify us in seriously attending, for a single moment, to such a suggestion; which, however, we must entertain, as true, if we do not believe their testimony.

In fine, our conclusion is, that the evidence adduced in support of this bill is sufficient to overcome the technical force of the answer and the moral weight of the evidence adduced to confirm it, and to establish the right of the plaintiffs to the relief which they have prayed.

Let a decree be entered, perpetually enjoining the defendants,

Tredick, Stokes & Co., from further prosecuting against the plaintiffs their suit upon the note in the pleadings mentioned; and that the said note be surrendered by said Tredick, Stokes & Co. to the plaintiffs, upon the delivery by the latter to the former of a proper transfer of fourteen shares of the capital stock of the Atlantic De Laine Company, in security for the debt due from the late firm of Hill, Carpenter & Co. to said Tredick, Stokes & Co.; and that, in the event of such surrender, no costs of this suit be taxed against the defendants, members of said firm of Tredick, Stokes & Co., but only against the defendants, members of the late firm of Hill, Carpenter & Co.; but in the event that such surrender be not made upon a tender of such transfer, then that the plaintiffs have and recover full costs of this suit against all the defendants.